*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0434P (6th Cir.)
File Name: 03a0434p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHEILA J. BELL,
    *Plaintiff-Appellant,*

    *v.*

OHIO STATE UNIVERSITY, et al.,

    *Defendants-Appellees.*

No. 02-3293

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-01274—Edmund A. Sargus, Jr., District Judge.

Argued: August 8, 2003

Decided and Filed: December 9, 2003

Before: BATCHELDER and ROGERS, Circuit Judges;
RUSSELL, District Judge.*

---

\* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

---

## COUNSEL

**ARGUED:** Erik G. Chappell, LYDEN, LIEBENTHAL & CHAPPELL, Toledo, Ohio, for Appellant. Craig R. Carlson, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees. **ON BRIEF:** Erik G. Chappell, LYDEN, LIEBENTHAL & CHAPPELL, Toledo, Ohio, for Appellant. Craig R. Carlson, David S. Bloomfield, Jr., PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. Sheila Bell appeals from the district court's order granting summary judgment to the defendants in their individual capacities on Ms. Bell's claims, brought under 42 U.S.C. §§ 1981 and 1983, that during her enrollment in, and ultimately her dismissal from, the Ohio State University College of Medicine, the defendants denied her due process and equal protection and discriminated against her because of her race and gender. The district court held that those claims which arose prior to July 6, 1996, were barred by the statute of limitations; that Ms. Bell had failed to present any evidence to support either a substantive or procedural due process claim; that Ms. Bell had neither stated an equal protection claim nor provided evidence to support such a claim; and that Ms. Bell had failed to make out a prima facie case of a violation of Section 1981, and, alternatively, that she had wholly failed to counter the defendants' evidence that she was dismissed from the College of Medicine for purely academic reasons. We affirm the judgment of the district court, although with different reasoning as to some of the claims.

## Factual Background

Sheila Bell is an African-American woman, who was admitted to the Ohio State University College of Medicine ("the medical school") in the fall of 1987. Although the parties are not in complete agreement about Ms. Bell's performance with regard to completing the requirements of the first two years of medical school, the essential facts are not genuinely in dispute. Ms. Bell started out in the Independent Study Program ("ISP"), where she had considerable academic difficulty and was warned that she was in danger of failing "Med Coll 662," which she was required to pass in order to advance to the second year of medical school. She was advised to transfer into the more traditional Lecture and Discussion Program ("LDP"), but she refused to do so and was permitted to continue in the ISP. Ms. Bell failed "Med Coll 662" and was permitted to repeat that course work in the LDP program; she then successfully completed her first year and moved on to her second year in the LDP program. Ms. Bell continued to have academic difficulty, and ultimately she was required to retake her second year. In June of 1992, after successfully completing her second year course work, she retook Part 1 of the national medical licensing examination ("the Boards"), which she had taken but had not passed during her first year of medical school; she did not, however, have her scores from Part 1 sent to the medical school. In August 1992, the medical school instituted a new requirement that students pass Parts 1 and 2 of the Boards before advancing to the third year curriculum, but because that requirement had not been in place when she entered medical school, Ms. Bell asked for and was granted permission to proceed to her third year of study without passing Parts 1 and 2 of the Boards.

Ms. Bell's problems continued through her third year of medical school, and again, the material facts are not genuinely disputed. In July and August of 1993, Ms. Bell took an Internal Medicine rotation at the Cleveland Clinic. Ms. Bell did not appear for her final written and clinical examinations

in the Internal Medicine program on August 27. Although Ms. Bell claimed at the time and continues to claim that she was too ill to take the exams, she does not dispute that she did not seek medical attention, or that she was not excused from appearing for the exams, either by anyone in the medical school in Columbus or at the Cleveland Clinic. Ms. Bell was not permitted to take the exams at a later date, but was told that she must repeat the two-month rotation before she would be allowed to take either the final written exam or the clinical exam; and she received an unsatisfactory grade for the rotation, in part because she failed to take the exams. She appealed her unsatisfactory grade to the Internal Medicine Evaluation Committee, which denied the appeal and required as remediation for the missed exams that Ms. Bell repeat one month—rather than two—of internal medicine rotation and take the clinical and written exams. Ms. Bell appealed this decision in turn to the Internal Medicine Appeals Committee, the Med III-IV Committee and the Student Progress Committee, each of which recommended that the appeal be denied.

While these appeals were pending, Ms. Bell was advised that she had received an "incomplete" for a rotation in Clinical Pediatrics in September and October of 1993, and that she would have six months to rewrite and resubmit her paper for that course. Also during this time period, Ms. Bell requested and received permission from the administrative assistant to the Med III-IV Committee to schedule a one-month internal medicine rotation at Mt. Carmel Hospital. She did not, however, advise the assistant that she intended this rotation to fulfill the remediation requirement for internal medicine. After she had completed the rotation in April 1994 Ms. Bell learned that because the medical school required that the remediation rotation be a "core" rotation at an Ohio State University Hospital, rather than an "elective" rotation at another hospital, the Mt. Carmel rotation did not satisfy the remediation requirement.

On May 25, 1994, the Clinical Academic Standing Committee sent Ms. Bell a letter advising her that she would not be permitted to graduate in June 1994. That letter further advised:

> The following issues must be resolved before you can be reconsidered for certification for graduation:
> 1. Successful passage and release of scores for USMLE, Step 2.
> 2. Release of scores for USMLE, Step 1.
> 3. Successful remediation of the core Internal Medicine rotation and exams as outlined by the department.
> 4. Successful resolution of Anesthesia elective or completion of another clinical rotation (awaiting grade).
>
> The earliest date you would be eligible to graduate would be at the end of Autumn Quarter.

At some point during May 1994, in response to Ms. Bell's inquiry, the administrative assistant to the Med III-IV Committee told Ms. Bell that although she would not be eligible to participate in the June graduation ceremony, she would be permitted to participate in the convocation ceremony. Ms. Bell was not, however, permitted to participate in the convocation, although she apparently did not receive the letter from the medical school advising her of that until after the ceremony.

During the summer of 1994, Ms. Bell complained to various officials at the Ohio State University, including the University Provost, that the College had not properly handled her appeals with regard to the internal medicine rotation requirement. On September 2, 1994, the Provost issued his report, stating first that his office did not have the authority to review the appeals, but nonetheless advising Ms. Bell that his review of her case resulted in his conclusion that the review process within the Medical College had been "fair and forthright." He further noted that her complaint had been

"reviewed by faculty committees at several levels and the outcome has always been the same." Ms. Bell did not pursue any further attempt to complete the requirements for graduation during the summer of 1994, and from September 1994 until June 1995, she was in Africa doing missionary work. During that period, she learned that she had been withdrawn from the medical school, but that she could apply for reinstatement. She did so, and on May 28, 1996, the medical school sent her a letter advising that her petition for reinstatement had been granted and further advising that:

> Your readmission is subject to the following conditions:
> 1) You must meet the current cognitive and non-cognitive standards of the College of Medicine, including passage of Step 1 and Step 2 of the USMLE.
> 2) You must meet all curricular requirements established by the Clinical Academic Standing Committee.
> 3) You will be granted an exemption from the College's Six-Year Rule until 7/31/97.
> 4) You must meet all the above requirements by July 31, 1997 or be subject to final dismissal from the College of Medicine.

This letter also instructed Ms. Bell to contact the Associate Dean for Student Affairs in order to resume her studies. Ms. Bell contacted the Associate Dean, but was unhappy with his instruction that she would need to complete at least one month of an internal medicine rotation. Ms. Bell expressed her dissatisfaction in a letter to the Dean of the Medical College, dated June 14, 1996, complaining that she had been denied due process during the 1994 appeals process, that she had satisfied the internal medicine rotation requirement, that but for the "lack of due process, general unfairness and harassment," she would have received her medical degree long since, and that unless the medical school corrected the problem, she would have no choice but to file a lawsuit.

Ms. Bell's threat of litigation did not have the desired effect, and the Clinical Academic Standing Committee advised her on September 9, 1996, that, if she wanted to continue her studies, she would be required to do one month of internal medicine at the Ohio State University Medical Center and to take and pass the clinical exam and the written final exam by June 30, 1997. Ms. Bell complied with neither of these requirements, and the Med III-IV Student Review Subcommittee recommended to the Clinical Academic Standing Committee that Ms. Bell be dismissed from the medical school. On October 24, 1997—after a meeting which in which Ms. Bell participated—the Clinical Academic Standing Committee recommended that she be dismissed for failure to complete the conditions to which her reinstatement was subject, including her failure to complete the internal medicine rotation and to take the exams. Ms. Bell was notified of the Committee's recommendation by letter dated October 27, 1997. The Committee's recommendation was reviewed by the Academic Review Board at a meeting which Ms. Bell attended and in which she was given the opportunity to present information. The Academic Review Board found that both the Student Review Subcommittee and the Clinical Academic Standing Committee had conducted their proceedings in accordance with the policies and procedures of the Medical College, and that the results of the Board's review and the recommendations of the Committees would be forwarded to the Dean. After review of all of the proceedings, the Dean notified Ms. Bell by letter dated December 24, 1997, that she had been dismissed from the Medical College and that she was not eligible for future reinstatement.

Ms. Bell filed suit against the defendants on July 6, 1998, in the United States District Court for the Eastern District of Michigan. That action was dismissed without prejudice for lack of subject matter jurisdiction. On December 17, 1998, Ms. Bell filed this action against Ohio State University, its Board of Trustees, the Ohio State University College of Medicine, and numerous officials and administrators of the

University and the College of Medicine in both their official and their individual capacities. The complaint claimed that the plaintiff has both a property interest and a liberty interest in her continued enrollment in the Medical College, and that the defendants had deprived her of those interests without due process and had denied her equal protection of the law, in violation of the Fifth and Fourteenth Amendments and the Ohio Constitution; had deprived her and conspired to deprive her of her rights on the basis of her race and gender in violation of 42 U.S.C. §§ 1981, 1983, 1985 and 1986; and had intentionally inflicted emotional distress and damaged her reputation and had intentionally breached "their contractual agreement to provide Plaintiff with a Doctor of Medicine Degree," in violation of Ohio law. The Complaint sought both monetary damages and injunctive relief.

The district court granted the defendants' motion to dismiss Ms. Bell's state law claims and her claims brought under 42 U.S.C. §§ 1985 and 1986. The district court then granted the defendants' motion for summary judgment on the claims brought under 42 U.S.C. §§ 1981 and 1983, holding that all the official capacity claims were barred by the Eleventh Amendment and that the claims against the defendants in their official capacities were either barred by the statute of limitations, unsupported by any evidence or wholly without merit. Ms. Bell now appeals from those portions of the district court's orders that granted summary judgment to the individual defendants on the Section 1981 and 1983 claims. She does not appeal the dismissal of the state law claims or the Section 1985 and 1986 claims, or the judgment dismissing the official capacity claims on the basis of the Eleventh Amendment.

**Analysis**

***Standard of Review***

We review de novo a district court's grant of summary judgment, using the same standard under Rule 56(c) used by

the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). We must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 341 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### Statute of Limitations

Ms. Bell contends that the district court erred in holding that to the extent that her Section 1981 and 1983 claims are based on events that occurred more than two years before she filed her first lawsuit, they are barred by the statute of limitations. Ms. Bell does not argue that the court applied an erroneous statute of limitations, but rather that the court erred in holding that the "continuing violations theory" is inapplicable to this case.

The date on which the statute of limitations begins to run in a § 1983 action is a question of federal law. *Sevier v. Turner*, 742 F.2d. 262, 272 (6th Cir. 1984). Ordinarily, the limitations period starts to run "when the plaintiff knows or has reason to know of the injury which is the

basis of his action." *Id*. at 273. "In determining when the cause of action accrues in section 1983 actions, we have looked to what event should have alerted the typical lay person to protect his or her rights." *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991).

*Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997). The exceptions to that rule are two: where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity whose effects continue into the present, *see Tolbert v. State of Ohio Dept. of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999); and where the plaintiff can show "a longstanding and demonstrable policy of discrimination." *Dixon*, 928 F.2d at 217. Ms. Bell contends that she has presented evidence sufficient to require the application of both of these "continuing violation" exceptions.

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), a Title VII action, the Court addressed the first of the two types of continuing violation, namely, the prior discriminatory activity that continued into the present. The Court held that while the continuing violation doctrine applies in hostile environment Title VII discrimination actions, it does not permit recovery for discrete acts of discrimination that occurred outside the statutory period. *Id.* at 113. That reasoning, this court recently held, applies to claims brought under Section 1983. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) ("We can find no principled basis upon which to restrict *Morgan* to Title VII claims, and we therefore conclude that the Supreme Court's reasoning must be applied to the firefighters' § 1983 claims.") We noted in *Sharpe* that *Morgan* does not implicate the second continuing violation exception, involving a longstanding policy of discrimination. *Id.* at 268.

Here, we conclude that all of the allegedly unconstitutional and discriminatory actions that took place prior to July 6, 1996, are discrete acts of which Ms. Bell was immediately

aware when they occurred, and Ms. Bell has presented no evidence of a longstanding policy of discrimination. We hold, therefore, that all of the Section 1983 claims based on events prior to July 6, 1996, are time-barred.

This circuit has not addressed the question of whether the reasoning of *Morgan* and *Sharpe* extends to discrimination claims brought under Section 1981. And, although Ms. Bell does not distinguish between her Section 1983 and 1981 claims with regard to the statute of limitations, this circuit has recently held that the presumptive four-year statute of limitations of 28 U.S.C. § 1658 applies to Section 1981 actions "premised upon alleged discriminatory actions occurring after the formation of the employment relationship." *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 514 (6th Cir. 2003). This latter issue, we note, is currently before the Supreme Court in *Jones v. R.R. Donnelley & Sons Co.*, 305 F.3d 717 (7th Cir. 2002), *cert. granted* 123 S. Ct. 2074 (May 19, 2003). We conclude, however, that it is unnecessary to decide whether the continuing violations exception applies to Ms. Bell's Section 1981 claim, because, as we will more fully explain below, Ms. Bell has wholly failed to provide any evidence to support her Section 1981 claim, regardless of when it accrued.

### The Remaining Section 1983 Claims

In order to state a claim under Section 1983, a plaintiff must allege the deprivation of a constitutional right caused by a person acting under color of state law. *Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998). In order to survive a motion for summary judgment, a plaintiff must present evidence sufficient to raise a genuine issue of fact material to her claim. *Klepper*, 916 F.2d at 341-42. Ms. Bell claims that she has both a property interest and a liberty interest in her continued enrollment at the medical school, and that the defendants' conduct unconstitutionally deprived her of both.

The undisputed facts establish that on May 9, 1995, Ms. Bell was involuntarily withdrawn from the medical school; that on May 28, 1996, her petition for reinstatement was granted subject to very specific conditions; and that on June 14, 1996, Ms. Bell objected to the terms of her reinstatement and threatened litigation. Ms. Bell did not comply with any of the required conditions of her reinstatement, and on December 24, 1997, after medical school academic committees at several levels reviewed her failure to comply with those requirements, the medical school dismissed Ms. Bell because of that failure. The issue before us is whether Ms. Bell has presented evidence sufficient to permit a jury to conclude that after July 6, 1996, in performing that review and in ultimately dismissing her, any or all of the defendants discriminated against her because of her race or gender, or deprived her of due process, either procedural or substantive, or denied her the equal protection of the law. We hold that she has not.

### 1. Procedural Due Process

"Because property interests are creatures of state law, [plaintiff] would have been required to show at trial that her seat at the Medical School was a 'property' interest recognized by [] state law." *United States v. Horowitz*, 435 U.S. 78, 82 (1978) (citations omitted). Ms. Bell gives us little to go on here. She points us generally to The Student Handbook and The Student Handbook Supplement for support for her belief that she had a property interest in her continued medical education at the medical school, but she cites to no particular provision of those handbooks. As further support for this proposition, she cites the deposition testimony of Dr. Kantor, an Associate Dean of the Medical College during some of the period when Ms. Bell was a student there: ". . . and it has always been the policy of the college, that once you're in, we try everything we can to help you pass and succeed."

Assuming, however, for the purposes of this summary judgment motion, that Ms. Bell does have such an interest, we hold that Ms. Bell has not presented any evidence that the defendants denied her procedural due process in reviewing her failure to comply with the conditions of her reinstatement or in dismissing her because of that failure. To the contrary, all of the evidence in this case demonstrates that, like the plaintiff in *Horowitz* (where the Supreme Court assumed without deciding that the plaintiff had a property interest in her medical school enrollment), Ms. Bell received "at least as much due process as the Fourteenth Amendment requires." *Id.* at 85. As was the case in *Horowitz*, the administration of the medical school advised Ms. Bell fully of her failures, explained the consequences, and "the ultimate decision to dismiss [plaintiff] was careful and deliberate." *Id.* Indeed, in Bell's case, medical school committees on at least three levels reviewed her failure to comply with the requirements upon which her readmission was explicitly conditioned, and she was given the opportunity to participate in at least two of those committees' reviews. The Fourteenth Amendment requires nothing more.

## 2. Substantive Due Process

Ms. Bell contends that she has a both a property interest and a liberty interest in continued enrollment in the Medical College; that those interests are subject to the protections of substantive due process; and that the actions of the defendants deprived her of those interests and denied her that protection. As we understand the argument she presents in her brief, Ms. Bell's principal contention is that she was arbitrarily and unfairly dealt with in 1994 with regard to both the medical school's insistence that she fulfill a remediation requirement after receiving an unsatisfactory grade for her internal medicine rotation, and the school's refusal to permit her to graduate because she had not fulfilled the remediation requirement. These matters are, as we have already held, outside the period of the statute of limitations. To the extent that Ms. Bell complains of any actions of the defendants that

occurred after July 6, 1996 (which is not clear either in her complaint or in her brief on appeal), she appears to contend that her ultimate dismissal from the Medical College was the result of her failure to complete the internal medicine rotation in 1994, and that the defendants' requiring her to take an additional month of an internal medicine rotation once she was reinstated—and dismissing her when she refused to comply—was racially discriminatory and, therefore, arbitrary, capricious, and unfair. We find no merit to these arguments.

The interests protected by substantive due process are of course much narrower than those protected by procedural due process. Most property interests warranting the protection of procedural due process, for instance, may be substantively modified or abolished by the legislature. *See, e.g., Atkins v. Parker*, 472 U.S. 115, 129-31 (1985). Interests protected by substantive due process, which the legislature may *not* infringe unless supported by sufficiently important state interests, include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that "shock the conscience," *see Braley v. Pontiac*, 906 F.2d 220, 224-25 (6th Cir. 1990), and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 321-23 (1982) (right to reasonable care and safety while in government custody); *Johnson v. Cincinnati*, 310 F.3d 484, 495-98 (6th Cir. 2002) (right to travel locally through public spaces and roadways);[1] *but see DeShaney v. Winnebago*

---

[1] Others recognized by the Supreme Court include:

the rights to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965); to use contraception, *ibid; Eisenstadt v. Baird*, 405 U.S. 438 (1972); to

*County Dep't of Social Servs.*, 489 U.S. 189, 194-197 (1989) (no substantive due process right to government protection from an abusive domestic situation). As the Supreme Court reasoned in denying a substantive due process right to commit suicide:

> we have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court.

> Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause.

bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952), and to abortion, [*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)].

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and quotations omitted). Where, as we explain below, there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process. *Cf. Gutzwiller v. Fenik*, 860 F.2d 1317, 1328-29 (6th Cir. 1988) (stressing, in the public university context, the similarity of equal protection and substantive due process).[2] Certainly the contention that the medical college's actions were arbitrary or capricious cannot be sufficient; otherwise judicial review for compliance with substantive due process would become the equivalent of a typical state or federal Administrative Procedure Act. *See, e.g.*, 5 U.S.C. § 706 (2)(A) (review of agency action under arbitrary or capricious standard).

Even if Ms. Bell could claim an interest in her continued enrollment that would be protected by substantive due process, she has presented no evidence that she was denied that protection by the defendants. In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Supreme Court addressed the claim of a medical student who

---

[2]None of the cases cited by Bell in support of her claim actually hold that such an interest exists. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 (1985) (assuming *arguendo* the existence of a constitutionally protected property right in continued enrollment in medical school); *Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 91-92 (1978) (assuming *arguendo* a constitutionally protected interest in continued enrollment in medical school); *Martin v. Helstad*, 699 F.2d 387, 390 (7th Cir. 1983) (assuming *arguendo* a property interest in law school admission); *Amelunxen v. Univ. of Puerto Rico*, 637 F.Supp. 426, 431 n.3 (D.P.R. 1986) (assuming *arguendo* that a student has a property or a liberty interest in continuing education). In fact, these decisions note that concerns of federalism, judicial capacity, and academic freedom counsel against the recognition of such an interest. *Ewing*, 474 U.S. at 226 (expressing "a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom"); *Horowitz*, 435 U.S. at 92 (noting that courts "are particularly ill-equipped to evaluate academic performance").

complained that the University defendants had denied him substantive due process after he failed Part I of the NBME, which was required in order for him to proceed to the final two years of the medical school program in which he was enrolled. Rather than permitting the plaintiff to retake Part I, the University dismissed him from the program after evaluating his entire academic record. The Supreme Court assumed, without deciding, that there was "a constitutionally protectible right in [the plaintiff's] continued enrollment." *Id*. at 223. Nonetheless, the Court made it clear that the judiciary's review of academic decisions is limited:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id*. at 225. The Court went on to point out that courts are ill-suited to "evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Id*. at 226 (quoting *Horowitz*, 435 U.S. at 89-90). Our review of the record in Ms. Bell's case persuades us beyond peradventure that, even if we assume that substantive due process protects Ms. Bell's interest in staying in medical school, the decisions of the defendants in this case, like the defendants' determination in *Ewing*, "rested on an academic judgment that is not beyond the pale of reasoned academic decision-making when viewed against the background of [her] entire career." *Ewing*, 474 U.S. at 227-28.

### 3. Equal Protection

Ms. Bell claims that she was treated differently from non-African American students and male students in the Medical College, and that her dismissal from the medical school was therefore in violation of the Equal Protection guarantee of the Fourteenth Amendment. The district court found that Ms. Bell had failed to provide any evidence whatsoever that she was treated differently from similarly situated students because of her race or gender, and we agree.

Although Ms. Bell claims that she was treated differently from similarly situated non-minority and male students, her brief on appeal points to no specific instances of such disparate treatment occurring after July 6, 1996. We have reviewed the record and conclude that it contains no evidence that during the statutory period the defendants treated Ms. Bell differently from any non-minority student or male student, or that they made any decisions or took any actions with regard to her on the basis of either her race or gender.

### *The Section 1981 Claim*

Ms. Bell claims that by virtue of her enrollment in the Medical College, she had a contractual relationship with the Medical College, and that the defendants discriminated against her with regard to that contract because of her race in violation of 42 U.S.C. § 1981. That section provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The statute defines the term "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The district court did not address Ms. Bell's claim that her relationship with the College was contractual, but held that Ms. Bell had presented no evidence, either direct or circumstantial, to support a claim of racial discrimination. We accept Ms. Bell's contention that she had a contract with the Medical College, *see Behrend v. State*, 379 N.E.2d 617, 620 (1977), and, as we noted above, we review this claim without regard to any statute of limitations. We find that Ms. Bell has wholly failed to present any evidence to support her claim that the defendants' actions were in violation of Section 1981.

Ms. Bell does not appear to appeal the district court's conclusion that she presented no direct evidence of race discrimination. In the absence of direct evidence, a claim of race discrimination under Section 1981 not only requires evidence sufficient to make out a prima facie case of discrimination under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework, *see Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992), it requires evidence that the discrimination was intentional. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389-91 (1982). To establish her prima facie case in the context of her contractual relationship with the Medical College, Ms. Bell must provide evidence that (1) she is a member of a protected class; (2) she suffered an adverse action at the hands of the defendants in her pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class. *See Mitchell*, 964 F.2d at 582 (noting that a plaintiff may substitute for the fourth element in the typical *McDonnell Douglas* framework evidence that similarly situated individuals outside the protected class received better treatment than he). Even assuming that Ms. Bell could meet the third element of the

prima facie case, she has come forward with not even a scintilla of evidence of the fourth, namely, that the defendants treated any similarly situated non-minority student differently from the way they treated Ms. Bell with regard to any aspect of her relationship with the Medical College. The district court correctly held that without such evidence, Ms. Bell had failed to make out a prima facie case of discrimination on the basis of race.

Ms. Bell argues before us that she met her burden by presenting her deposition testimony. According to Ms. Bell, she testified that she knew Caucasian students were permitted to retake exams, but she was not given that opportunity. Ms. Bell declares,

> [i]n essence, the trial Court requires that Plaintiff identify by name an individual who received more favorable treatment. This is not required under the law. Plaintiff testified that she was aware that Caucasian students were treated differently. This is sufficient evidence of disparate treatment . . . . Plaintiff has indeed come forth with sufficient evidence to demonstrate that the students who were allowed to retake exams had the most important characteristic, namely, they were Caucasian. The trial Court requires too much when it asks the Plaintiff to identify the similarly situated students by name, etc.

Not surprisingly, Ms. Bell cites no authority for this proposition. Merely reading Fed. R. Civ. Pro. 56(e) would disabuse her of this view:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial.

FED. R. CIV. PRO. 56(e) (emphasis added). And this circuit has long held that "[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1274 (6th Cir. 1974) (per curiam).

We think it is important to note here that not only does Ms. Bell egregiously misstate the law, she egregiously misstates her own deposition testimony. When asked whether she was aware of other students who had missed the final exam for the internal medicine rotation in August of 1993, or who had been permitted to take makeup exams in internal medicine after missing the final, Ms. Bell responded that she did not know of or could not recall any such students. When asked whether she knew of any student who had been allowed to take makeup exams in any other clinical rotation, she said that she knew of such a student but could not recall the student's name, the clinical rotation at issue, or any other specific detail about the student or the rotation. Significantly, she did not remember whether this unidentified student was a member of a minority race, although she thought the student was male. In short, we have read Ms. Bell's deposition and we conclude that it contains no information whatsoever in support of her claim that she was treated differently from similarly situated medical students on the basis of her race, her gender or any other characteristic.

Further, as the district court correctly held, Ms. Bell has presented no evidence whatever that the defendants purposefully discriminated against her on the basis of her race. To the contrary, the evidence is overwhelming that Ms. Bell did not meet the academic requirements of the Medical College and was withdrawn in 1994; the defendants reinstated her and went to great lengths to give Ms. Bell every opportunity to do those things which were required of her in order to earn her medical degree; when she failed and refused to comply with the requirements, the defendants engaged in three levels of committee review of that non-compliance; in 1997, after Ms. Bell had complied with none of those

requirements, the defendants dismissed her for purely academic reasons. In short, she has wholly failed to present any evidence to support her claim that the defendants violated Section 1981.

### Conclusion

For the foregoing reasons, we **affirm** the judgment of the district court.