NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0583n.06

Case No. 25-1405

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 17, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOLENA BROWN, | ) | |
|     Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) | |
| FCA US LLC, | ) | OPINION |
|     Defendant-Appellee. | ) | |

Before: NALBANDIAN, DAVIS, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. Jolena Brown began working at Chrysler's Michigan-based headquarters in 1999. By all accounts, Brown performed well in her various human-resources roles at the company—now named FCA US LLC. But in 2017, her work quality began to slip. After multiple interventions failed to turn Brown's performance around, FCA terminated her employment in 2021. Brown, in response, sued FCA under Title VII and Michigan law. She alleges that FCA's actions qualified as discrimination and retaliation on the basis of race and sex. The district court granted summary judgment to FCA on Brown's Title VII claims and dismissed her Michigan-law claims without prejudice. We affirm.

I

FCA US LLC, an automaker headquartered in Auburn Hills, Michigan, hired Jolena Brown, a black woman, in 1999. During her 21 years with the company, Brown's titles changed but the essence of her job as a labor-relations specialist in FCA's human-resources department remained the same. By 2016, she held the position of an Employee Relations Lead at FCA's headquarters.

Although Brown started strong in that role, her performance spiraled starting in 2017. LeRoy Richie, Brown's supervisor and colleague of "many years," had valued Brown as a "top performer" up until then—and gave her a rating of "8" (out of 10) in her 2016 performance assessment. Richie Decl., R.25-16, PageID 556. But by mid-2017, Richie believed that the quality of Brown's work had slipped. Later that year, Brown moved to FCA's Mopar plant and shifted into yet another position. Her supervisor there, Stephanie McDonough, shared Richie's concerns. Together, Richie and McDonough agreed to give Brown a rating of "5" for the 2017 assessment. *Id.* But later, and without Richie's knowledge, McDonough changed the rating to "4." *Id.*

Brown responded to the downgrade by filing a racial-discrimination complaint against McDonough in February 2018. She alleged that McDonough "rated her low on her 2017" assessment "without regard to her performance." 2018 Compl., R.25-7, PageID 425. She also asserted that McDonough "purposely avoid[ed] [Brown] and other African-American team members." *Id.* After interviewing Brown and six other witnesses, an external investigator hired by FCA concluded that McDonough did not violate FCA's discrimination policy. FCA reported these findings to Brown and revised her score on the 2017 performance assessment to a "5" because McDonough's unilateral downgrade "was a variation in the appropriate process." Richie Decl., R.25-16, PageID 557. Still, the revised assessment noted multiple areas for Brown's

improvement, including: "meet[ing] deadlines," holding herself "accountable on following-up or meeting target dates," and "communicat[ing] her priorities." Revised 2017 Assessment, R.25-17, PageID 564. At that point, Brown "considered [the complaint] resolved"; she filed no additional discrimination complaints during her remaining time at FCA. Brown Dep., R.25-2, PageID 200-02.

Over the next three years, Brown transferred jobs at FCA two more times. After her performance at Mopar remained "unsatisfactory," Brown returned to FCA's headquarters at Auburn Hills, where she started work as a Union Relations Specialist. Richie Decl., R.25-16, PageID 557. Brown stayed in that role for only a few months—receiving another "5" rating for the year of 2018—before she relocated to FCA's Sterling Heights Assembly Plant in 2019. At Sterling Heights—her final placement with FCA—Brown worked as a Labor Relations Supervisor under Ed Novacco. In that role, she oversaw labor-relations representatives, received and responded to union grievances, tracked employee attendance, and dealt with union members' disciplinary issues.

Novacco, too, noticed problems with Brown's performance. "[U]nion leadership, members of management[,] and Brown's peers" alike filed complaints about Brown's "lack of communication and unreliability." Novacco Decl., R. 25-3, PageID 357. To name a few of the reported problems: Brown was "repeatedly absent from required meetings," provided no "coaching, training, or guidance" to her direct reports, failed to follow through on union disciplinary issues, failed to memorialize agreements with the union, and made frequent misstatements. *Id.* at PageID 357-58.

Novacco first attempted to address Brown's issues through a performance-improvement plan. He consulted with Kelly Bennyhoff, a human-resources specialist at FCA, about the details.

3

Together, the two drafted a plan that required Brown to complete specific tasks and objectives in 30-, 60-, and 90-day intervals; those tasks covered areas like "Union Relations," "Attendance and Timekeeping," and "Grievance & Disposition Management." *Id.* at PageID 358-59. The plan's time and task intervals coincided with meetings with Novacco and Bennyhoff, at which Brown was expected to bring documentation showing her progress. "Failure to" complete the action items, the improvement plan's terms expressly warned, could "result in discipline, up to and including termination." Performance Improvement Plan, R.25-10, PageID 469.

Brown didn't respond well—or really at all—to the improvement plan. When Novacco and Bennyhoff first informed Brown about the plan in early October 2020, she failed to "refute" their "concerns" or "provide explanations for any of the" identified "deficiencies." Novacco Decl., R.25-3, PageID 359. At the first 30-day review meeting, Brown had completed only one of the sixteen tasks set for that deadline and denied making any changes to certain "process[es]," as required by the plan. Brown Dep., R.25-2, PageID at 209-11, 217-18. The 60-day review meeting proceeded no better. Brown had made "unacceptable" progress towards the plan's objectives and, in the meantime, problems with her communication and inaccurate payment reporting had continued to pile up. Performance Improvement Plan, R.25-10, PageID 466-67.

Bennyhoff and Novacco terminated Brown at her 90-day review meeting on January 4, 2021. Both agreed that they had "no evidence [that] Brown had completed the vast majority of the [improvement plan's] requirements and that Brown's performance overall remained unsatisfactory." Novacco Decl., R.25-3, PageID 360. So they made the joint decision to fire Brown for her "lack of ability to" complete the improvement plan's objectives. Bennyhoff Dep., R.25-9, PageID 439.

4

Brown recalls a different version of events. In her view, the plan had nothing to do with her performance issues and everything do to with her "refus[al] to pay some union employees" after she "identified discrepancies in their reported time." Brown Decl., R.28-1, PageID 634. The union representatives, in Brown's telling, then "complain[ed]" to Novacco about her "actions." *Id.* She alleges, too, that Novacco became upset with her after she refused to provide "confidential information" about other employees. Brown Dep., R.25-2, PageID 271-72. As for the improvement plan's deliverables, Brown counters that she did complete some of the improvement plan's objectives. But she cannot "recall" showing any supporting documents to Novacco and did not produce any evidence on that score in discovery. *Id.* at PageID 209, 219-20, 228, 246.

Brown filed a discrimination complaint with the Equal Employment Opportunity Commission. A right-to-sue letter followed. Brown then sued FCA under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA). Relevant here, her complaint generally asserted claims of sex- and race-based discrimination and retaliation. It did not identify any details regarding the alleged discriminatory incidents. After discovery, FCA moved for summary judgment on all claims. In response, Brown filed a declaration that alleged, for the first time, that her supervisor at Auburn Hills "treat[ed] a white male coworker preferentially, including taking him out to lunch and chit-chatting with him while refusing to speak to [her]." Brown Decl., R.28-1, PageID 634.

The district court granted summary judgment to FCA on the Title VII discrimination and retaliation claims. It determined that Brown failed to establish a prima facie case of race and sex discrimination because she "offered no" evidence that "she was treated differently than similarly situated male or white employees" with "the same or similar" track record of performance issues. Order, R.31, PageID 665. As for the retaliation claim, the district court concluded that Brown

failed to "identify a causal relationship between her" internal race discrimination complaint in February 2018 and "her termination nearly three years later in January 2021." *Id.* at PageID 666. Finally, the district court refused to exercise supplemental jurisdiction over Brown's ELCRA state-law claims and dismissed those claims without prejudice.

Brown timely appealed, and we have jurisdiction. 28 U.S.C. § 1291.

II

We review the district court's summary-judgment ruling de novo. *B.A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 789 (6th Cir. 2025). That means we ask the same questions as the district court: Did FCA show that there are no genuine disputes as to any material facts? Is it entitled to judgment as a matter of law? *See* Fed. R. Civ. P. 56(a). These questions give Brown the "benefit of all reasonable factual inferences." *Bivens v. Zep, Inc.*, 147 F.4th 635, 642 (6th Cir. 2025). Yet it remains her burden to counter FCA's initial showing by identifying "evidence on which the jury could reasonably find for [her]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[M]ere conjecture and speculation" won't cut it. *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). Nor will "vague assertion[s]" or "conclusory" allegations. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 761 (6th Cir. 2000).

III

Brown asserted claims of race and sex discrimination, along with retaliation. We affirm the grant of summary judgment to FCA on both claims.

A

We start with Brown's discrimination claims. Title VII prohibits employers from discriminating on the basis of sex or race. *See* 42 U.S.C. § 2000e–2(a)(1). Because Brown provides no direct evidence to that end, we analyze her circumstantial evidence under the burden-

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under *McDonnell Douglas*, Brown must initially establish a prima facie case of discrimination by showing (1) "she was a member of a protected class"; (2) "she suffered an adverse employment action"; (3) "she was qualified for the position"; and (4) "she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (citation and internal quotation marks omitted). If she succeeds, the burden shifts to FCA "to offer a legitimate, non-discriminatory explanation for its actions." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The burden then "shifts back to the plaintiff to show pretext"—meaning "that the employer's explanation was fabricated to conceal an illegal motive." *Id.*

On three of the prima facie elements, all parties agree. FCA does not dispute that Brown, as a black woman, is a member of two protected classes. Brown, for her part, concedes that FCA's only "adverse employment actions" were the performance-improvement plan and her termination. Brown Br. 10, 15. And FCA does not contest that Brown was qualified for her various positions.

Only one element, then, remains in dispute: whether Brown "was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Briggs*, 11 F.4th at 508. To assess this element, we look at a variety of context-specific factors—like whether the "similarly-situated" individuals "dealt with the same supervisor," were "subject to the same standards," and "engaged in the same conduct" in the absence of circumstances that "would distinguish" their actions or the "employer's" reaction to it. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (citation omitted).

Brown failed to carry her threshold burden on that score. Specifically, and as the district court correctly concluded, Brown did not show that another employee engaged in the same

7

performance-related conduct without receiving the same consequences. During discovery, she produced no evidence that FCA treated white or male employees with similar performance issues differently. Indeed, during her deposition, Brown could not list a single employee whom FCA retained following a failure to meet improvement-plan objectives. What's more, Brown provided no evidence that she "was replaced by someone outside the protected class." *Briggs*, 11 F.4th at 508. We have held that employees failed to satisfy their prima facie burden in similar circumstances. *E.g.*, *Mensah v. Mich. Dep't of Corr.*, 621 F. App'x 332, 336 (6th Cir. 2015) (no prima facie case where Title VII plaintiff "failed to present a similarly-situated employee"); *Morris v. Fam. Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 340 (6th Cir. 2009) (similar); *cf. Gjokaj v. U.S. Steel Corp.*, 700 F. App'x 494, 504-05 (6th Cir. 2017) (rejecting a discrimination claim where the plaintiff could "not identif[y] any other similarly situated . . . employee who engaged in comparable behavior, but was not terminated"). And we do so again here.

Brown pushes back by noting that "comparator evidence is not a rigid . . . 'requirement,'" and she's right. Brown Br. 10 (citation omitted). To satisfy their prima facie burden, plaintiffs bringing Title VII discrimination claims need not "demonstrate an exact" match in all areas "with the employee [who] receiv[ed] more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citation and internal quotation marks omitted). Yet even if our standard is "easily met," it requires at least *some* relevant comparator evidence in circumstantial cases like Brown's. *Jackson*, 814 F.3d at 776 (citation and internal quotation marks omitted). Brown offered none.

Brown next asserts that "circumstantial evidence . . . can give rise to an inference of discrimination even in the absence of a comparator." Brown Br. 11. But Brown cites no legal authority for the position that, in the absence of *any* comparator evidence, other circumstantial

evidence may satisfy the similarly situated element. Instead, the only cited legal source for her contention—*Chen*, 580 F.3d at 400 n.4—addressed employers' pretext, not stand-ins for comparator evidence.

In any event, Brown's proffered circumstantial evidence fails to advance her discrimination claims. To start, Brown argues that she was "placed on" an improvement plan "without prior documented performance concerns." Brown Br. 11. But the record belies her assertion. In both 2017 and 2018, Brown received a "5"—a downgrade from prior years' scores—on her performance assessment. Richie Decl., R.25-16, PageID 556-57. And both assessments specifically listed multiple areas for improvement related to Brown's failure to meet deadlines and her consistent communication shortcomings.

Brown's remaining circumstantial-evidence argument lacks any evidentiary support. She alleges that FCA "transferred [her] to a failing department" and "subjected [her] to excessive workloads." Brown Br. 11. But she offers no record citations—other than self-serving statements in her declaration—to prove these assertions. Brown, as the non-moving party, must "cite specific portions of the record" to show that a material dispute of fact exists. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997); *accord* Fed. R. Civ. P. 56(c). And under our long-settled law, "mere conclusory and unsupported allegations," like the ones Brown relies on here, cannot "meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (alteration adopted) (citation and internal quotation marks omitted). Nor can Brown's "[m]ere personal beliefs" about the quality of her workplace. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (citation omitted).

In a similar vein, Brown argues that FCA "denied [her] equal access to mentoring and professional camaraderie compared to white male colleagues." Brown Br. 11. That argument

refers to her late-breaking allegation that a supervisor at Auburn Hills took "a white male coworker" "out to lunch" and "chit-chatt[ed] with him while refusing to speak to [her]." Brown Decl., R.28-1, PageID 634. Again, Brown's only proof of this interaction is a single, "unsupported" sentence in her declaration. *Bell*, 351 F.3d at 253. As noted, that's not enough to defeat summary judgment. *Id.* But even if Brown had sufficient evidence, this point would get her no further. "Title VII" does not "set forth a general civility code for the American workplace," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). Brown does not argue that her supervisor's alleged lunch snub at Auburn Hills qualified as an adverse employment action in the first place. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024) (adverse action requires "some harm respecting an identifiable term or condition of employment"). So her nebulous allegation about lack of "equal access" to "professional camaraderie" cannot sustain her claim. Brown Br. 11.

B

Next, we consider Brown's retaliation claim, which also arises under Title VII. 42 U.S.C. § 2000e–3(a). So we once again apply the *McDonnell Douglas* burden-shifting framework. Here, too, Brown must establish a prima facie case. This time, she must show (1) she engaged in "activity protected" under Title VII; (2) FCA knew about that activity; (3) FCA responded by taking a "materially adverse" action against her; and (4) a "causal connection" exists between the protected activity and the adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). As with Brown's discrimination claims, her retaliation claim fails at the prima facie stage.

Although Brown satisfies the first element (protected activity), she stumbles on the second (FCA's knowledge of the protected activity). FCA agrees that Brown's 2018 complaint against McDonough for racial discrimination qualifies as protected activity for Title VII purposes. So we

next ask whether the "relevant management decisionmakers" knew about her "exercise of [that] protected activity." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).

Brown offers no direct or circumstantial evidence that the relevant decisionmakers at FCA—Novacco and Bennyhoff—knew about her 2018 complaint. Instead, she hypothesizes that they must have known because they "operated within the same HR and labor management structure." Brown Br. 14. She then speculates that the 2018 complaint sparked the "transfers," the "pattern of treatment," and a "questionable" performance-improvement plan. *Id.* Brown, however, must do more than offer "conspiratorial theories" and "speculation[]" to prove knowledge on her managers' part. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). And by her own telling, she "considered" the 2018 complaint "resolved" after the investigation. Brown Dep., R.25-2, PageID 200. That admission, along with Brown's failure to offer any proof of knowledge on Novacco's or Benyhoff's part, is fatal to her claim. *See Fenton*, 174 F.3d at 832.

But even if Brown did clear the knowledge hurdle, she failed to prove any causal connection between her protected activity and the adverse actions. Title VII retaliation claims require proof satisfying the "traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). That is, Brown must point to evidence demonstrating that the unlawful retaliation—here, Novacco and Bennyhoff's decisions to put her on a performance-improvement plan in late 2020 and fire her in 2021—would not have occurred in the absence of Brown's protected conduct. *Id.*

But Brown offers no concrete evidence that her 2018 complaint was the but-for cause of Novacco and Bennyhoff's actions. If anything, the only evidence pertinent to causation points in the other direction. In a declaration, Novacco stated that Brown's firing "was wholly unrelated to Brown's race, gender, or age or to any protected activity in which she might have engaged."

11

Novacco Decl., R.25-3, PageID 361. Brown did not depose Novacco or otherwise present evidence that she sought to discover whether he had knowledge of her 2018 complaint. As for Bennyhoff, she testified at her deposition that she and Novacco terminated Brown for Brown's "lack of ability to meet the requirements of the" plan. Bennyhoff Dep., R.25-9, PageID 439. During Bennyhoff's questioning, Brown's counsel failed to ask Bennyhoff whether she knew about Brown's 2018 complaint or any other discriminatory or retaliatory actions. Having failed to adduce any causation-related evidence, Brown cannot now benefit from the record's bare-bones state.

Timing presents another problem for Brown. The adverse actions occurred nearly three years after Brown's 2018 complaint. That time gap alone is all but decisive against causation under our caselaw. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 289 (6th Cir. 2012) (gap of more than a year "does not raise the inference that the protected activity" is the "likely" cause of the adverse action (citation and internal quotation marks omitted)); *Lindsay v. Yates*, 578 F.3d 407, 418-19 (6th Cir. 2009) ("[T]emporal proximity" is "sufficient to establish" a "causal connection" only where "an adverse employment action occurs *very close* in time after an employer learns of a protected activity."). Brown tries to bridge this three-year gap by alluding to "escalating adverse actions, all following her protected activity." Brown Br. 16. But these vague allegations, without more, sound in speculation, not the specific facts required by our summary-judgment standard. *See Mulhall*, 287 F.3d at 552.

Brown also ignores her history of performance issues. Indeed, she asserts that the improvement plan, which "follow[ed] years of acceptable performance," further supports a "retaliatory inference." Brown Br. 17. But Brown has it backwards. As the plan outlined, "unacceptable" performance led to her termination, and, regardless, Richie noticed and

documented a slippage in the quality of Brown's work in early 2017—a year before she filed her 2018 complaint. Performance Improvement Plan, R.25-10, PageID 466.

In short, Brown has "fail[ed] to make a showing sufficient to establish the existence of" the causation "element essential to [her] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). That evidentiary failing provides yet another basis for rejecting her retaliation claim.

Brown last seeks to save her retaliation claim by falling back on other protected activities she allegedly pursued. Brown Br. 12. According to Brown, this Court may find another basis for retaliation by looking beyond her 2018 complaint to other reports, including "internal complaints about unequal treatment, reports of timekeeping and wage violations, and resistance to conduct she reasonably believed was unlawful." *Id.* Brown's alternative retaliation theory also lacks merit.

*First*, Brown has not substantiated making any other "internal complaints about unequal treatment." *Id.* Although she cites "complaints about being treated less favorably than her white and male peers," Brown Br. 13, Brown does not allege (even in her declaration) that she voiced her grievances about being excluded from "lunch" and coworker "chit-chat[]" to management. Brown Decl., R.28-1, PageID 634. And Brown's deposition tracks with that evidentiary omission: She admitted that she did not file another internal discrimination complaint after the one she lodged against McDonough in 2018. Brown Dep., R.25-2, PageID 201-02.

*Second*, even if we assumed arguendo that FCA engaged in wrongdoing regarding "reports of timekeeping and wage violations," Brown does not tie these alleged violations to cognizable Title VII discrimination. Brown Br. 12-14. Title VII's retaliation prohibition covers employees who oppose "[u]nlawful employment practices" under the statute—a term of art that encompasses a range of discriminatory "actions taken on the basis of race, color, religion, sex, or national origin." *Niswander v. Cincinnati Ins.*, 529 F.3d 714, 719-20 (6th Cir. 2008). Internal advocacy

13

"related to" an employee's "job responsibilities" may qualify as protected activity if that advocacy concerns practices that Title VII prohibits. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 345 (6th Cir. 2021). But aside from a conclusory statement that "her reports often included concerns that impacted protected groups," Brown offers no actual proof that her reports about "timekeeping and wage violations" concerned discriminatory practices. Brown Br. 12-13. Without more, this alleged protected activity cannot support a Title VII retaliation claim.

*Third*, Brown's vague reference to her "resistance to conduct she reasonably believed was unlawful" also misses the mark. *Id.* at 12. Brown never identifies *what* unlawful conduct she resisted. That "perfunctory" treatment alone forecloses her argument. *Bivens*, 147 F.4th at 649 (citation omitted). To the extent that Brown intends to reference her allegation that Novacco "requested protected health information about Black employees from [her], in violation of confidentiality expectations," that point likewise fails. Brown Br. 8. Even assuming that Novacco's requests violated some unidentified "confidentiality expectation," Brown does not allege that Novacco sought the records as part of a discriminatory act "taken on the basis of race" or some other protected characteristic. *Niswander*, 529 F.3d at 720-21. So no Title VII violation would follow.

\* \* \*

We affirm the judgment of the district court.

14