NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0437n.06

No. 10-3876

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Apr 24, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| CYNTHIA HOPKINS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CANTON CITY BOARD OF EDUCATION, | ) | NORTHERN DISTRICT OF OHIO |
| DIANNE TALARICO; KAREN WILLIAMS; | ) | |
| JUDITH ROBINSON, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, Chief Judge; COLE and COOK, Circuit Judges.

COOK, Circuit Judge. In this race-based employment discrimination action, Cynthia

Hopkins, a teacher and former school administrator, sues the Canton City Board of Education

("Board"); Karen Williams, the former Canton City School District ("CCSD") Director of Secondary

Education; Judith Robinson, the former CCSD Director of Human Resources; and Dianne Talarico,

the former CCSD Superintendent. Hopkins presented five claims: a 42 U.S.C. § 1983 claim and a

"conspiracy" claim alleging unconstitutional deprivations of substantive and procedural due process,

an employment discrimination claim and a retaliation claim under Ohio Revised Code § 4112, and

a claim for wrongful discharge in violation of public policy. The district court granted summary

1

judgment in favor of the defendants on all claims, and Hopkins appeals all but the public policy and

conspiracy claims.[1]  We affirm.

## I.  Background

Because this appeal concerns appellees' summary judgment motion, we summarize the facts

in the record and draw all reasonable inferences in the light most favorable to Hopkins, *see*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), without weighing the

evidence or determining the truth of any disputed matter, *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249 (1986).

Hopkins, an African-American, began her career in CCSD as a math teacher in 1997.  Four

years later, CCSD promoted her to the position of Coordinator I at the Multi-County Juvenile

Attention Center ("Multi-County"), a school for students in the juvenile justice system.  As

coordinator, Hopkins evaluated and disciplined teachers, monitored education and curriculum,

ensured that the school met goals and standards, and performed other managerial tasks at the school.

CCSD's Director of Secondary Education, Karen Williams, served as Hopkins's supervisor.  Every

school year, Williams reported in her regular, state-mandated evaluations that Hopkins met

expectations—four reviews in all.  CCSD Superintendent Dianne Talarico and Director of Human

---

[1]She also mentions a "Title VII claim," not raised at the district court and thus not subject to appellate review.  *See* 28 U.S.C. § 1291.

Resources Judith Robinson used these evaluations in determining whether to renew employment contracts. Talarico, Robinson, and Williams are Caucasian.

Hopkins confronted teachers who used questionable teaching techniques or did not teach the school district's curriculum, and she developed her own methods for evaluating staff, though the CCSD later rejected them as unauthorized. In her third year at Multi-County, Hopkins encountered resistance to her management style. The teacher's union filed an unfair-labor-practice charge against the Board alleging that Hopkins interfered with attempts to engage bargaining unit members in protected activities. Hopkins formally apologized and the union withdrew the charge. She also engendered criticism by bypassing district protocol (e.g., communicating with a lawyer from a different school system about a legal issue, attempting to obtain another school district's contract without going through Human Resources, arranging to administer a standardized test without supervisor approval, hiring a student as a tutor without Board approval, and meeting with representatives of an alternative education program without consulting those in charge of approving such programs).

Despite these circumstances, Hopkins received a positive evaluation from Williams. Shortly afterwards, in anticipation of the expiration of Hopkins's three-year administrator contract, Talarico, Robinson met with Hopkins to discuss her performance. Williams recommended nonrenewal, but Talarico nevertheless renewed it for one year.

Hopkins encountered further problems with the teachers' union concerning a Caucasian teacher she supervised, Greg Soper. Shortly after Hopkins recommended nonrenewal of Soper's contract, Soper told the union president that Hopkins confronted him with specifics about his past, telling him that she "knew" about his background and warning him to stay away from administrators. Then, around the last day of school, Hopkins gave gifts to all her staff, including manicure sets, which she gave to all the male teachers. When Soper complained about receiving the manicure set, which he perceived as feminine and insulting, the CCSD placed Hopkins on paid administrative leave. Robinson sent Hopkins a letter describing the superintendent's intention to investigate allegations about Hopkins's inappropriate behavior and use of unauthorized evaluation methods to assess her staff.

While Hopkins was still on administrative leave, Williams and Robinson ordered Hopkins to sign a pre-written resignation letter, though the Board had renewed her contract for the upcoming year. Hopkins refused, and referred the matter to her attorney. During negotiations between Hopkins's attorney and defendants regarding the potential resignation, the CCSD reassigned Hopkins to serve as an administrative assistant at Hartford Middle School. Hopkins reported to the school's principal and assistant principal, had no management duties, and performed menial tasks, but maintained her "coordinator" salary level.

Soon after she began her new job, Williams sent Hopkins a letter criticizing her for conflicts with teaching staff and concluding that she "[does] not have the talents and skills that [CCSD] and

the Canton School community expect in its administrators," though Williams's prior evaluations had been uniformly positive. Williams retired about a month before the date on the letter, and wrote it at the request of CCSD. Robinson admitted that this was the only time that CCSD personnel asked a retired supervisor to change an employee evaluation. Further, Williams testified that "someone" had altered the letter she submitted to CCSD Human Resources personnel before sending it to Hopkins on official CCSD letterhead.

The Williams letter affected Hopkins's later evaluations. Williams's replacement, Brenda Neel, concluded in her first evaluation of Hopkins that she met CCSD expectations, despite serving in a more limited role at Hartford. Yet three months later, Neel evaluated Hopkins again and recommended that CCSD not renew her administrator contract, relying solely on the criticisms in the Williams letter. Talarico relied on Neel's recommendation in denying renewal. With the support of the director of the multi-county detention facility, Hopkins appealed the nonrenewal decision to the Board, but the Board rejected Hopkins's appeal. Shortly after the nonrenewal, she filed a discrimination charge with the Ohio Civil Rights Commission, complaining that the CCSD chose not to renew her contract because of her race.

Having retained the right to return to a teaching position after the expiry of her administrator contract, Hopkins assumed a teaching position for the next school year (and continues to teach at CCSD as of this appeal). While teaching, Hopkins applied for twelve administrative positions with the CCSD (e.g., Chief Information Officer, elementary school principal, middle school assistant

5

principal, entry-level administrative intern). Although Hopkins was qualified for the positions, the CCSD only interviewed her for a few positions and eventually hired others—ten Caucasians and two African-Americans. According to Hopkins, some of the hired candidates lacked proper certification and administrative experience.

Hopkins also perceives systemic racial inequities in the CCSD's practices. Specifically, she believes that the CCSD disciplines Caucasian personnel differently from African-American personnel. As an example, Hopkins recounts that the Caucasian assistant principal at a CCSD high school was caught on tape disparaging an African-American teacher in a conversation with an elementary school principal, yet both remained administrators. The CCSD's aggregate data also revealed a discrepancy between the racial composition of CCSD students and the racial composition of CCSD staff.

## II. Analysis

This court reviews de novo a district court's grant of summary judgment. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A district court may not grant summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets this burden, the nonmovant must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## A. State Discrimination Claim

Hopkins argues that a reasonable jury could infer that defendants violated Ohio Revised Code § 4112.02(A) by discriminating against her on the basis of race. "Ohio's own antidiscrimination laws found in [Ohio Revised Code] Chapter 4112 are modeled after Title VII," *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007), and "federal case law interpreting Title VII of the Civil Rights Act of 1964 . . . is generally applicable to cases involving alleged violations of [Ohio Revised Code] Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 421 N.E.2d 128, 131 (Ohio 1981). We therefore assess Hopkins's case under the usual Title VII burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

According to Hopkins, evidence of pervasive statistical disparities in the CCSD's racial composition, the hiring of less qualified Caucasian candidates, and the defendants' unusual efforts to negate her positive evaluations may persuade a reasonable trier of fact to return a verdict in her favor. The defendants respond that Hopkins fails to establish a prima facie case for discrimination and cite deficiencies in Hopkins's performance and qualifications as the cause of her poor evaluations, the nonrenewal of her contract, and decision to hire others for administrative openings.

7

### 1. Prima Facie Case

A prima facie case requires the plaintiff to show that "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class . . . [or] treated differently than similarly situated non-protected employees." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (citations omitted). The parties focus on the fourth element, disputing whether defendants treated her differently than similarly situated Caucasians by transferring her, declining to renew her administrative contract, and failing to hire her for new positions.[2] To draw a comparison to "similarly situated" Caucasians, Hopkins must compare herself to someone who is similar in "all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks and citations omitted); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

---

[2]Hopkins also criticizes the CCSD's decision to place her on administrative leave before the transfer, and Williams's post-retirement about-face in contradicting her prior positive reviews. Although these acts provide context for the transfer and nonrenewal decisions, they in themselves do not qualify as adverse employment actions. *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("[S]uspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." (citations omitted)); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) (holding that negative evaluations, in themselves, do not constitute adverse employment actions); *Mowery v. City of Columbus*, 2006-Ohio-1153, at ¶ 23 (Ohio Ct. App. 2006) (same).

a) Transfer

Hopkins fails to present a suitably similar employee. As she sees it, defendants placed her on administrative leave without giving her an opportunity to explain herself, and then abruptly transferred her to a position of lesser responsibility at a new school despite her expressed unwillingness to do so. She contends that defendants have never transferred a Caucasian administrator in this manner. But Hopkins is not similar to "Caucasian administrators" as a class. According to the letter directing Hopkins to take administrative leave, defendants placed Hopkins on leave for two reasons. First, they wanted to investigate allegations that Hopkins evaluated her staff using unauthorized methods and criteria. Second, they planned to investigate allegations of "unprofessional behavior" and "inappropriate behavior toward staff"— namely, Hopkins's alleged comments about Soper's past and her allegedly effeminate gift to him. It follows that a similarly situated Caucasian administrator would be someone facing allegations of comparable gravity.

Hopkins next compares herself to two Caucasian administrators who remain administrators despite, she says, triggering a lawsuit by disparaging an African-American female teacher. But, crediting Hopkins's version of the facts, a jury could not reasonably conclude that a employee who caused chronic legal and managerial difficulties over the course of a year—sparking a labor action, compromising the Board's bargaining position against a problem teacher, and repeatedly overstepping the established procedures and divisions of responsibility designated by her superiors—is "similarly situated" with two administrators who exercised poor judgment in an

9

isolated conversation that caused a lawsuit. Hopkins disputes the seriousness of these incidents, but

does not deny that they occurred.

### b) Nonrenewal

For similar reasons, Hopkins cannot create a jury issue on nonrenewal. Over the years,

Talarico recommended the nonrenewal of many underperforming Caucasian employees. And again,

the particularities of Hopkins's situation do not compare with any other administrator's described

in the record. Talarico grounded her decision not to renew Hopkins's contract on Hopkins's

interference with a union representative, complaints from the union, the administrative leave,

reprimands, and supervisors' concerns. Williams testified that her concerns regarding Hopkins

began during the 2003-2004 school year, when Hopkins faced the union difficulties, the

controversies with Soper, and the administrative leave.

Williams detailed the reasons for the nonrenewal in her post-retirement letter. First, she

faulted Hopkins for evaluating a teacher with methods not approved in the Board's agreement with

the teacher's union. Williams criticized Hopkins for providing a problem teacher a bargaining chip

by which to pressure the otherwise unwilling Board into giving him a six-month contract. Second,

Williams described a pattern of perceived failures in following directions and adhering to a chain

of command. Hopkins consulted a lawyer from a different school system, despite Williams's express

instructions to direct legal inquiries through approved channels. Though instructed to obtain copies

of other school districts' contracts through Human Resources, she contacted the other school district

directly. She arranged to administer a standardized test, hired a student as a tutor, and usurped others' duties when she met with representatives of an alternative education program—all without appropriate supervisor approval. Moreover, defendants believed, although perhaps erroneously, that Hopkins did not attempt to discipline staff who lost track of students on a field trip. Last, Williams criticized a staff handbook Hopkins wrote for its condescending tone, and she cited the manicure set incident to support her perception of Hopkins's poor relations with staff.

Hopkins attempts to create a fact issue regarding similarity of situation by characterizing defendants' concerns as manufactured: essentially, a papering of her file in preparation for nonrenewal. But even assuming these to be sham reasons, it does not follow that Hopkins was the victim of *race* discrimination. Hopkins highlights that, though defendants expressed their concerns about the above incidents to her as they occurred, the concerns inexplicably intensified after her last evaluation at Multi-County. Yet Hopkins's race remained an unchanging factor during that intensification, as did the hiring decisionmakers. The supervisor who "papered her file" with a post-retirement critique was the same supervisor who, as Hopkins repeatedly emphasizes, rated her as meeting expectations and wrote glowingly of her efforts to improve the school in her first two years as an administrator. At oral argument, Hopkins's counsel conceded that the post-retirement critique does not demonstrate race-based animus on Williams's part, but contended that another defendant might have pressured Williams into writing the letter. Talarico and Robinson, like Williams, however, worked in the same capacity both before and after Hopkins's fall into disfavor. Nor does Hopkins explain why the same Board that was race-blind enough to foster Hopkins's earlier

11

career—and even promote her from a teaching position to an administrative position—would inject racial animus into its decision-making seven years after her hire. In short, Hopkins unearthed no evidence that racial attitudes changed among the defendants over the course of her employment. Because the facts do not permit an inference of race discrimination, Hopkins fails to meet her prima facie burden with respect to her nonrenewal. *See Lindsay v. Yates*, 578 F.3d 407, 416 (6th Cir. 2009) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)) (explaining that, however one characterizes the four elements of the prima facie case, the prima facie step ultimately requires showing that "acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors").

### c) Rejection of Job Applications

Hopkins applied for several administrator positions, but the defendants rejected her each time. Unlike previous arguments, Hopkins here presents clear evidence of different treatment (hiring versus rejection) *and* some evidence of similarity of situation, since the summary judgment record contains descriptions of some of the successful candidates' qualifications. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (interpreting the fourth prong to require, in a promotion discrimination case, that "other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied"). The defendants contest whether the successful Caucasian candidates had "similar qualifications" to Hopkins, pointing out the candidates' comparative advantages (e.g., ability to verbalize a good

understanding of the job, the extent of prior administrative experience, prior experience working at the same school, and the lack of personal conflicts). Each candidate, of course, brings a different combination of strengths and weaknesses. A fact issue exists for the jury on whether any given combination appears similar to Hopkins's particular set of qualifications.

### 2) A Legitimate, Non-Pretextual Reason

Because Hopkins raises no fact issue with regard to her transfer and nonrenewal accusations, only the hiring-discrimination allegations survive to the second and third step of *McDonnell Douglas*. The Board alleges that it favored the selected candidates because they had more relevant job experience, reflected a clear understanding of the duties of the position, and brought all of the requested documentation to interviews. Since the Board articulates legitimate, nondiscriminatory reasons for their hiring choices, the burden shifts to Hopkins to show pretext.

A plaintiff may "succeed in [establishing pretext] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S at 804-05); *see also Spengler v. Worthington Cylinders*, 615 F.3d 481, 493 (6th Cir. 2010) (suggesting that one may show pretext by demonstrating lack of basis in fact, showing that the reason offered is untrue, or showing that the reason offered does not explain the action). Hopkins takes the second approach, arguing that she possessed the proper certifications and qualifications, but that the defendants nevertheless hired uncertified, less qualified candidates.

The parties dispute whether Hopkins brought the necessary documentation of her qualifications to her interviews. But even if a factual question exists regarding Hopkins's qualifications or compliance with interview instructions, she cannot show pretext because she presents no admissible evidence of her competitors' qualifications. The district court correctly disregarded her deposition testimony on other candidates' lack of certification, concluding that the testimony did not establish a foundation for her claimed knowledge of others' qualifications. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will* be admissible at trial to demonstrate that a genuine issue on a material fact exists . . . ."); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible." (internal quotation marks and citation omitted)). *See also* Hopkins Dep. 110:11-13 (expressing uncertainty in her knowledge for one candidate, with the statement, "I'm not sure if she was certified either").

The sparsity of evidence describing the qualifications of Hopkins's competitors harms Hopkins's ability to create a fact issue on pretext. However qualified Hopkins herself may have been, she cannot undermine the Board's proffered explanation merely by heralding her own abilities. She must present some admissible evidence that would allow the jury to conclude that the selection of candidates contradicts the defendants' purported criteria.

Hopkins criticizes defendants' explanation of successful candidates' qualifications for being vague. But lack of specificity hurts Hopkins's argument rather than defendants', because a plaintiff bears the burden of showing pretext. She also argues that she had the same qualifications as some of the hired candidates. For example, she complains that the Board hired a Caucasian applicant for Lehman Middle School who had experience teaching there, even though she had comparable teaching experience (albeit at a different school). That matters not. Though Hopkins only needed to show that a hired competitor had "similar qualifications" at the prima-facie-case stage, at the pretext stage she must show that a reasonable jury could infer that the Board's professed reasons are unworthy of credence. The Board explained that they preferred the homegrown candidate because she had a track record of success *at that school* and familiarity with the parents, students, and staff there. Hopkins presents no reason to doubt this legitimate reason for preferring this candidate. *See Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (noting that "Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates," and that an employer has even greater flexibility in choosing a management-level employee). It is not enough to assert that she was qualified for the positions, nor can she prevail by presenting a fact issue on whether she was more qualified than another candidate. Rather, the divergence in qualifications must be so striking as to raise a fact issue on whether the Board lied. We conclude that no reasonable jury could find pretext, given the absence of evidence contradicting the Board's hiring criteria.

Lacking individual comparison points, Hopkins turns to statistics. She explains that, historically, about 75 percent of principals have been Caucasian, in a school district where about 90

15

percent of teachers are Caucasian and about half of the students are minorities. The Supreme Court, in *Hazelwood School District v. United States*, 433 U.S. 299, 308 (1977), acknowledged that systemic disparities can reflect the cumulative effect of years of discriminatory hiring practices, but explained that one should compare the racial composition of the staff to the *relevant labor market*, rather than to the student population. Hopkins provides no evidence of the racial composition of the pool of qualified administrator candidates in the Canton teaching market. The sole evidence of the composition of an administrator applicant pool comes from the printout documenting the races of each applicant in the twelve positions Hopkins sought. This document not only provides a skewed sample (the applicant pool for every position includes Hopkins, when the total number of applicants for a position ranged from three to ten people), but the small sample size limits the usefulness of the data in drawing a reasonable inference of pretext. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530 n.12 (6th Cir. 2007) (concluding, in dicta, that evidence was "of doubtful relevance" where sample size appeared to be very small and parties did not present statistical analysis on that data), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2352 (2009).

Hopkins also calls attention to the fact that the Board hired Caucasians for ten of the twelve positions for which she applied (the remaining two were African-Americans). Even with this more targeted statistic, the small sample size remains a problem because chance and other factors (such as better qualifications) remain a likely explanation. *See Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437 (6th Cir. 2002) (acknowledging that "there are three possible explanations for the [statistical] discrepancy: the operation of legitimate selection criteria, chance, or the defendant's

16

bias," and determining the existence of a fact issue on bias only after concluding that disparity is "more likely than not due to the defendant's bias" (citation omitted)).

Hopkins likens her data to the statistical evidence in *Hopson*, but that case explicitly relied on the "statistically significant" racial disparity *and* "independent circumstantial evidence of discrimination" to determine that the statistic raised a fact issue. Hopkins offers neither. At oral argument, Hopkins's counsel emphasized the number of Caucasians hired, but given the predominantly Caucasian makeup of the applicant pool, the fact that the CCSD hired Caucasians for ten out of the twelve positions Hopkins applied for suggests no gross disparity to create a fact issue on disparate treatment, and Hopkins does not allege disparate impact.

At oral argument, Hopkins's counsel acknowledged the need for independent circumstantial evidence of discrimination, in addition to statistical evidence, to establish pretext. He urges us to interpret defendants' unusual maneuvers regarding Hopkins's employment record as circumstantial evidence of discrimination. As explained previously, however, no reasonable jury could conclude that these machinations—if indeed they are machinations—evidence race discrimination, given the record facts. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (acknowledging that some cases may present a record where, even if a plaintiff "set[s] forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," such as when a plaintiff "create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent

evidence that no discrimination had occurred"). In any case, no evidence suggests that the people involved in the alleged papering of Hopkins's record participated in the hiring decisions involving Hopkins.

Given the lack of similarly situated administrators facing Hopkins's disciplinary circumstances, the complete absence of record evidence from which a factfinder could infer pretext for hiring discrimination, and the inconclusive statistical data unaccompanied by any expert analysis, we conclude that no genuine issue of material fact exists for the jury regarding the state discrimination claim.

## B. Retaliation Claim

The district court granted summary judgment in defendants' favor on Hopkins's retaliation claim under Ohio Revised Code § 4112.02(I). Hopkins maintains that a genuine issue of material fact exists regarding whether defendants rejected her applications for administrative openings in retaliation for her filing of a discrimination charge with the Ohio Civil Rights Commission ("OCRC") in March 2005. Defendants deny this, arguing that Hopkins failed to show causality between her filing and the rejections.

Like the state discrimination claim, a state retaliation claim generally draws from Title VII case law. But one crucial distinction exists. Title VII does not permit individual liability, *see Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404-05 (6th Cir. 1997), but Ohio's state remedy does. *See*

Ohio Rev. Code § 4112.99 (permitting civil action for damages and injunctive relief against any violator of Chapter 4112). This difference explains why the federal analysis does not scrutinize the extent of a defendant's actual participation in the alleged discrimination. Such considerations, however, *are* germane to the state law analysis.

The state analysis otherwise follows the familiar *McDonnell Douglas/Burdine* burden-shifting framework. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009). Under both Ohio law and federal law, Hopkins must first establish a prima facie showing that "(1) [Hopkins] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger*, 879 N.E.2d at 180 (citing *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). The defendants must then articulate a legitimate, nondiscriminatory reason for their decisions, after which Hopkins must prove pretext. *Burdine*, 450 U.S. at 253.

The parties agree that Hopkins engaged in a protected activity by filing a charge with OCRC and a complaint in the district court, and defendants do not deny awareness of Hopkins's filings. They do dispute the third and fourth prongs, however, questioning which of the defendants participated in the hiring process and whether a causal connection exists between the protected activity and the decisions not to hire Hopkins.

19

### 1. Lack of Participation in Adverse Employment Action

Defendants agree with Hopkins that the rejection of job applications qualifies as an "adverse employment action" but contend that Williams, Talarico, and Robinson did not participate in the hiring decisions.

Hopkins testified that she began applying for jobs in 2006. The district court rightly concluded that the retaliation claim cannot succeed against Williams, who retired before Hopkins began applying for openings. Talarico and Robinson did not participate in the rejections either. Robinson testified that as Director of Human Resources she did not participate in the application screenings for administrator positions. No evidence in the record indicates otherwise. Furthermore, the uncontroverted evidence reveals that Talarico played no role in the hiring process until the interview stage (i.e., after the first-round or second-round committee narrowed the field to two or three top candidates for interview). Talarico attested that no one had recommended Hopkins to her for interview, and that she ceased working for CCSD on August 31, 2006 before any of Hopkins's interviews.

Hopkins does not quarrel with these descriptions of Talarico's and Robinson's roles (or lack thereof) in the hiring process. She accuses "defendants," generally, of discriminating against her during the application process, but does not specify what, if anything, the individual defendants did wrong. Although Hopkins testified that she applied for openings while Talarico still worked for CCSD, the undisputed evidence indicates that other CCSD personnel screened her out of

20

consideration before the applications reached the stage where Talarico would have weighed in. By the time Hopkins reached the interview stage on other applications, Talarico no longer worked for CCSD.

Furthermore, because § 4112 does not create vicarious liability for individuals, Hopkins cannot hold Williams, Talarico, and Robinson liable for their subordinates' rejections of her applications. In *Genaro v. Central Transport, Inc.*, 703 N.E.2d 782 (Ohio 1999), the Ohio Supreme Court narrowly held that individual supervisors and managers are accountable for their own discriminatory conduct, stopping short of recognizing respondeat superior liability for individuals. *Id.* at 787 ("[T]his court's pronouncements in cases involving workplace discrimination . . . evidence that individual supervisors and managers are accountable for *their own* discriminatory conduct occurring in the workplace environment." (emphasis added)).

The absence of evidence from which a reasonable juror could infer participation thus precludes Hopkins from establishing a prima facie case against the individual defendants.

## 2. Lack of Causal Connection

The question remains whether liability may attach to the Board for its agents' actions. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken

had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563 (citing *Equal Employment Opportunity Comm'n v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

Hopkins urges us to defer the causation issue to a jury without scrutinizing her prima facie showing because a "jury decides factual issues relating to causation." *See Collins v. Rizkana*, 652 N.E.2d 653, 658 (Ohio 1995) (citation omitted). As *Bailey v. Floyd County of Board of Education* explained, however, "[a] court may . . . grant summary judgment on the issue of causation when warranted," though, "[o]rdinarily, causation is a question to be resolved by a jury." 106 F.3d 135, 145 (6th Cir. 1997) (citations omitted) (granting summary judgment where plaintiff failed to create a genuine issue that protected activity caused discharge). That an issue concerns a question of fact does not excuse the plaintiff from presenting enough evidence to persuade a reasonable jury.

Hopkins next asks the court to infer causation from the scarcity of minorities among CCSD administrators and staff, the individual defendants' unorthodox and inconsistent assessments of her performance, and the number of times the CCSD hired allegedly less qualified candidates. The first two arguments do not demonstrate causation because Hopkins's protected activity cannot cause events that preceded it. And even assuming all of the hired candidates were less qualified, a reasonable jury cannot infer causation without evidence that the Board knew about Hopkins's job applications or evidence that the hiring decisionmakers knew about Hopkins's OCRC complaint. Hiring decisionmakers cannot "retaliate" when unaware of the supposed triggering act. Likewise, the Board cannot retaliate by adverse employment action, even if it wishes to punish, when it does

22

not realize that an opportunity to do so exists. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir. 2007) (factoring in defendant's lack of knowledge of protected activity in determining that the temporal proximity between protected activity and adverse action raised no fact issue on causality); *cf. Turnbull Cone Baking Co. v. Nat'l Labor Relations Bd.*, 778 F.2d 292, 296 (6th Cir. 1985) (noting, while addressing similar causation issue in the context of National Labor Relations Act, that "[a]s a matter of causation, there can be no finding of discrimination based on an employee's engaging in a protected activity unless the employer was aware of or suspected the employee's activity").

The record contains no evidence that the Board knew about Hopkins's applications or that the hiring committee members responsible for Hopkins's rejections knew about the OCRC complaint. The superintendent presents only the finalist's application to the Board. None of Hopkins's applications survived the interview stage. The record only identifies two individuals who personally participated in reviewing Hopkins's applications: Superintendent Michele Evans (Talarico's successor) and Director of K-12 Education Dan Nero (Williams's equivalent). No record evidence suggests that these individuals knew about the protected activity. And even if they did, the lack of evidence suggesting that the other decisionmakers in the hiring committee knew about the protected activity weakens the inference that one member swayed the group into making a retaliatory decision. *See Warnsley v. Toledo Bd. of Educ.*, 2011-Ohio-3134, at ¶¶ 55-57 (Ohio Ct. App. 2011) (refusing, in a retaliation case, to impute one entity's knowledge of protected activity to other entity that made adverse employment decision, because absent decisionmakers' *actual* knowledge plaintiff

cannot establish link between protected activity and adverse action); *Wilcoxson v. U.S. Postal Serv.*, 812 F.2d 1409, 1987 WL 36561, at *3 (6th Cir. 1987) (per curiam, unpublished table decision) (affirming involuntary dismissal of Title VII retaliation claim where, even assuming that "employer" knew of protected activity, plaintiff presented no evidence that the actual decisionmakers knew).

Because no reasonable jury could conclude that Hopkins established a prima facie case of retaliation, we need not progress to the second or third step of the *McDonnell Douglas* analysis. We affirm the district court's grant of summary judgment on this claim as well.

## C. Procedural Due Process Claim

Hopkins argues that defendants deprived her of a property interest without procedural due process by transferring her to a lesser position before her contract expired. Defendants claim qualified immunity. They also respond on the merits that the transfer did not affect any property interests protectable under the Fourteenth Amendment and that, in any case, they did not deprive Hopkins of the property interest she claims.

A state cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amd. XIV. Hopkins must therefore demonstrate a property interest, a deprivation, and the absence of due process.

### 1. A Property Interest Exists

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). "To have a property interest in a benefit, a person [must] . . . have a legitimate claim of entitlement to it." *Id.* at 577. "[Such entitlements are] created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Id.*

Hopkins contends that Ohio law entitled her to remain an administrator for the duration of her one-year contract, without any abatement of responsibilities. *See* Ohio Rev. Code § 3319.02(C) ("Except by mutual agreement of the parties thereto, no assistant superintendent, principal, assistant principal, or other administrator shall be transferred during the life of a contract to a position of lesser responsibility.").

Defendants characterize Hopkins's entitlement as illusory because Ohio Revised Code § 3319.01 empowers a superintendent to assign employees. *See id.* (providing that "the superintendent shall direct and assign teachers and other employees of the district or service center"). Their argument fails. Under Ohio law, "If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both." *See* Ohio Rev. Code § 1.51. Section 3319.01 generally charges the superintendent with assigning employees, but § 3319.02(C) specifically limits the superintendent, while carrying out this duty, from transferring an administrator

25

under contract to a position of lesser responsibility. The superintendent's general duty of assigning employees coexists with the specific limitation that she cannot assign administrators under contract to positions of lesser responsibility. *See States ex rel. Specht v. Painesville Twp. Local Sch. Dist. Bd. of Educ.*, 407 N.E.2d 20, 22 (Ohio 1980) (citations omitted) (stating that court will not conclude that one statute negates the effect of other unless the two statutes are "irreconcilable by any means of interpretation" or "are so repugnant to or contradictory with each other" as to evidence legislature's intent to change the law). Defendants' interpretation would render the transfer protections in § 3319.02(C) a nullity, because under their theory § 3319.01 would supersede § 3319.02(C) in all instances.

Accordingly, we agree with Hopkins that Ohio Revised Code § 3319.02(C) creates a property interest that entitles her to remain as an administrator and to maintain a steady level of responsibility until the expiration of her administrator contract.

### 2. No Deprivation of Property Interest

Defendants deny depriving Hopkins of her employment interests, positing that her new position at Hartford Middle School did not reduce her responsibilities, Ohio Rev. Code § 3319.02(C) (prohibiting transfer to "a position of lesser responsibility"), and that she transferred by "mutual agreement," *see id.* ("*Except by mutual agreement of the parties thereto*, no . . . administrator shall be transferred . . . ." (emphasis added)).

26

A genuine issue of material fact exists regarding whether the position at Hartford involved fewer responsibilities than the Multi-County position, notwithstanding the unchanged salary. Hopkins's evaluator described both Hopkins's post-transfer role and assignments as "limited." A reasonable jury could conclude that an administrative-assistant position that requires creating educational videos, registering new students, lunchroom monitoring, and no supervisory duties, involves fewer responsibilities than a coordinator position that requires evaluating and disciplining teachers, monitoring curriculum and school standards, and direct accountability to the CCSD's Director of Secondary Education. Though the defendants protest that Hopkins unfairly belittles her responsibilities at Hartford, we construe facts in her favor at the summary judgment stage.

Nevertheless, Hopkins cannot demonstrate deprivation of a property interest under § 3319.02(C) because the undisputed facts compel the conclusion that she transferred by mutual agreement. Under Ohio law, a party may show assent by performing duties consistent with the putative agreement. *See State ex rel. Smith v. Etheridge*, 605 N.E.2d 59, 62 (Ohio 1992) (observing that, ordinarily, state law validates an unwritten school employment understanding where "the employee performs his or her duties as though a written contract were present"); *cf. Lee v. C.D.E. Home Inspection Co.*, 2002-Ohio-4316, at ¶ 26 (Ohio Ct. App. 2002) (stating, after observing that "mutual consent is essential to every agreement," that such consent to the terms of an agreement may "be explicit, [or] by performance or part-performance" (citations omitted)); 17 Ohio Jurisprudence Contracts § 29 (3d ed.) ("An acceptance may be implied from the circumstances, such as where the offeree begins performance or accepts payments without rejecting the offer.").

Assuming the facts in the nonmovant's favor, Hopkins initially refused to resign from the Multi-County position, and did not know about any proposed agreements that her attorney negotiated with defendants. Nevertheless, when Hopkins received a call from her attorney and from Robinson informing her that she "need[ed] to report to Hartford Middle School," she reported to Hartford. Even if we assume that Hopkins simply arrived at Hartford the first day to comply with a last-minute phone call (i.e., without any prior intent to accept the position), Hopkins's continued performance establishes that she agreed to assume the Hartford position, even with its reduced responsibilities. Upon showing up at Hartford, she set up an office there. She completed the tasks the principal assigned to her, such as registering students, though she knew those tasks reflected a reduction in her responsibilities. Then, about a month into the school year, Neel and Robinson met with Hopkins and provided her with a list of duties to perform at Hartford. The parties do not dispute that Hopkins performed the duties of her new position for the remainder of the school year. Her evaluations at Hartford document that she "completed her performance goals," "willingly became a member of the Hartford community as evidenced by her presence at athletic events, after-school programming, parent meetings, and other events," and fulfilled her duties. *See* Robinson Dep. Ex. 4, at 2, Oct. 5, 2009, ECF No. 43-1 (indicating in handwritten note to evaluation that "Ms. Hopkins strives to be sure she's working within the parameters of her role").

Although Hopkins "did not wish" to transfer to Hartford, and would not have chosen to transfer there but for the defendants' decision to reassign her, she did not refuse the position. *Cf. Maust v. Bank One Columbus, N.A.*, 614 N.E.2d 765, 769 (Ohio Ct. App. 1992) ("[T]o have to

28

choose between resigning or being fired may constitute an unpleasant choice, but absent other compelling circumstances that instance can hardly be viewed as constituting duress." (alterations and internal quotation marks omitted)). A reasonable jury could not find that Hopkins refused or unknowingly assumed a transfer position of lower responsibility when she knew about the reduced duties of her new job yet continued to report to the new location for work, her own résumé acknowledges serving as a Hartford administrative assistant, and she submitted to evaluations assessing whether she measured up to the duties of the position.

In conclusion, no procedural due process violation occurred because Hopkins assented to the transfer. Furthermore, because the individual defendants did not violate Hopkins's constitutional right to procedural due process, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (granting the lower courts discretion in following the *Saucier* procedure). Municipal immunity applies as well, because Hopkins fails to argue that any of the Board's policies or customs affected her transfer right. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). We affirm the district court's grant of summary judgment on this claim.

D.  Substantive Due Process Claim

Hopkins asserts that defendants deprived her of her fundamental right to remain in a position of public employment free from arbitrary action.  Defendants oppose, maintaining that no such substantive due process right exists.  We agree with the defendants.

As acknowledged in *Sutton v. Cleveland Board of Education*, "[s]ubstantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental . . . [and] implicit in the concept of ordered liberty . . . ."  958 F.2d 1339, 1350-51 (6th Cir. 1992) (internal quotation marks omitted).  Hopkins cites *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), for the proposition that loss of academic government employment violates substantive due process whenever the decision presents "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *See id.* at 225.  But that case does not aid Hopkins.  The *Ewing* Court expressly declined to decide whether a fundamental right exists to be free from arbitrary state action.  Assuming without deciding that the right exists, the Court concluded that the state action in that case would not violate such a right because it "rested on an academic judgment that is not beyond the pale of reasoned academic decisionmaking." *Id.* at 223, 227-28.

The other case Hopkins cites, *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988), also fails to bolster Hopkins's argument.  In that sex-based employment discrimination case involving a public university, our circuit extended the concept of a "fundamental right" to include "the

individual's liberty interest in not being terminated from governmental employment for a constitutionally impermissible purpose." *See id.* at 1329. *Gutzwiller* reversed the district court's grant of summary judgment on a substantive due process claim, reasoning that, because a sex-based employment decision would be arbitrary and capricious *and contrary to the equal protection clause* (i.e., "for a constitutionally impermissible purpose"), the defendants potentially violated a substantive due process right. In other words, even if one assumes that the defendants arbitrarily transferred Hopkins out of her administrative role, the arbitrariness does not itself violate due process. Rather, *Gutzwiller* recognizes a narrow substantive due process right to protection against losing one's job because of an independent constitutional violation, such as an equal protection violation.

A recent case, *Bell v. Ohio State University*, 351 F.3d 240 (6th Cir. 2003), confirms this narrow understanding of *Gutzwiller*. *See id.* at 251 (holding contention of "arbitrary or capricious" employment decision insufficient to establish a deprivation of substantive due process, because if that were the rule, then *any* procedural irregularity in government action could qualify as a substantive due process violation). The operative difference between *Bell* and *Gutzwiller* is the finding of an equal protection violation. The district court resolved Hopkins's equal protection claim in defendants' favor, and Hopkins does not challenge that claim on appeal. Because defendants did not transfer Hopkins for a constitutionally impermissible purpose, we conclude that their actions do not implicate a substantive due process right.

31

III.  Conclusion

We affirm.